The dispute in this case arises from the imposition of the Idaho motor fuels tax with respect to the sale by licensed distributors of fuel to tribally owned retail stations on three Indian reservations in our state. There are three distributors involved, all of which again are licensed to distribute gas by the Idaho Tax Commission. Let me ask you a question or two. I was kind of interested in that statutory phrase licensed traders. I know it mostly comes up in connection with traders on Indian reservations. Is there any statutory definition of licensed traders or is there any statutory use of licensed traders except for Indian reservations? Your Honor, in terms of whether there is any statutory definition of licensed traders, the at least in Indian law context, the only licensing is provided for under 25 U.S.C. Sections 255 through 261, which is of course the Indian trader statute. In terms of whether there are other... Are there any other licensed traders? I can't think of what kind of trade you need a license for except on an Indian reservation. On military basis, I'm not aware that you need a license and I think you just, if you want to open a store, it's PX and they open it up for bids, but I'm not sure. Your Honor, I've not examined the issue of whether the term licensed trader is used in any other context, but with respect to Indian reservations... I think our remarks are for national parks typically, but I don't know if they're licensed traders, are they? Well, I think more often than not, they're referred to as concessionaires, but as we point out in our briefs, Your Honor, I think it's important when you read Section 10 of the Hayden-Coffright Act to not only look at the term licensed traders, but also the term reservation. As we point out in the brief, at the time of the statute's enactment in 1936, the only case law, and I think there were 14 or 15 such cases, the only case law which used both terms in the same case involved Indian reservations. So certainly its most Is there any use in the U.S. code of the term licensed trader other than in the Indian Trader Act? Your Honor, again, I've not examined that question. I do not know at this point. I was also wondering about something else. I was thinking, I wonder if even if you prevailed generally as to these distributors, whether Indian and tribal purchasers would be entitled to individual tax exemptions by showing ID and filing a form or giving a form to the distributor showing that the purchase is for the Indians. Your Honor, the Idaho tax is imposed, at least from Idaho's perspective, of course, on the distributor. I have a question on federal law and order. We have to determine, as I understand it, as a matter of federal law, as to where the legal incidence of the tax was. Am I correct in that that's a federal law question for us? I mean, if legislators in Idaho want to give their opinion about it, they can. We can consider it, but they don't have a right to determine that question. Your Honor, I would respectfully disagree on that. What precedent do you have that would suggest that it's not a federal law question? Are you saying it's not a question of federal law where the legal incidence of the tax lies? No, it's certainly a question. Where the legal incidence of the tax lies is certainly a federal question. Okay. But it is a question that is determined with reference to legislative intent. That is, say, the intent... It's okay what the legislators say, but it's not conclusive, is it? Your Honor, I believe it is conclusive, as indicated... Can you tell me what precedent would say that what the legislators say is conclusive? Your Honor, the precedent is that which we cite in our briefs. That is to say, the 1995 Supreme Court decision in Chickasaw, where Justice Ginsburg stated that absent an expressed allocation of legal incidence, the Court looks to the overall nature and flow of the involved statute. So, for example... Which case was that again? That's the 1990... Chickasaw? That the Court has given legislatures this authority, of course, is reflected also in the 1976 Moe decision, where the Court cited in the footnote the Montana legislature's ultimate consumer bore the incidence of the tax. It was a cigarette tax, as opposed to the tribal retailer. Mr. Steele... Here's what's bothering me about this. You can address it any way you want to. What bothers me about the appellant's case is this. As I understand it, the initial Idaho Tax Act pretty much was determined, impossibly, for our purposes, to have been intended to have a legal incidence on the tribe. The Idaho Supreme Court said that. So, that seems like that's how we should view the first act. Now the Idaho legislature amends the act, and But the operative provisions of the act seem to put the onus of the tax squarely on the tribe. Like, the distributor has to bill the tribes. Distributors have to bill the retail level. If they don't pay the distributor, the distributor gets some sort of refund on the tax. Plus, if the distributor gets a tax refund at the end of the year, the distributor has to pay it back to the retail people. Everything looks like a pass-through, just in terms of how the statute operates. So, what am I missing there? That's what bothers me about the case being stated in favor of the tax. It seems like the way the tax operates, that the weight of the tax, the burden of it, is on the retail level, which is on the Native American tribe. There's a long history in this country that states can't tax that. So, that's my concern. I'm just going to judge. You might be able to change my mind or persuade the other two. But I'd like to, if you could address that at some point in your argument, I'd appreciate it. Well, Your Honor, I think it's appropriate to address it at this point, since your questions are fresh in everyone's mind. And let me make several points. First, the statute has changed substantially since the Goodman Oil decision in 2001. As we discussed in our brief, not only does the legislature state in Section 1 of Chapter 174 of the Amendatory Act that it is its intent to impose the legal incidence on the distributor with respect to receipt of fuel, but it also modified in Section 2, Section 63-24021, which now states that the receipt of fuel by the distributor is the taxable event. If the Court were to go back and review the Goodman Oil decision, there was ambiguity in the statute prior to its 2002 amendments with respect to exactly what the taxable event was. So, for example, in that case, the tax commission argued that the distributor bore the legal incidence. But both the trial court and the taxpayer, Goodman Oil, argued that the ultimate consumer bore the legal incidence. And the Idaho Supreme Court settled in between on the retailer. But now, even as modified, doesn't the statute give the distributor a credit on the tax if the retailer doesn't pay for it when billed? That is correct. It would also require the distributor to give money back to the retailers if they paid the tax, but then they get some kind of tax rebate. That is correct. Under Section 63-24076, if an account is deemed worthless, that is to say, a distributor sells gas to a retailer, and the distributor is never paid, the distributor can seek a deduction with respect to the amount of the tax that would have been passed on. Now, I think we have to distinguish carefully, in terms of your question, between who bears the legal incidence of the tax, which is in large measure, in fact, we believe in total measure, asking some kind of almost due process problem. Who bears the legal incidence and who bears the economic incidence of the tax? I have the same concern that Judge Gould has been asking you about. Let me see if I can come at it from a slightly different way. It seems to me that what you're saying is that we can't look at what the statute has done here, that somehow that's irrelevant, that once the Idaho legislature declares that the legal incidence of this tax falls on the distributor, we must accept that without regard to how the tax is actually collected. And I'm bothered by, I think, the same thing that's bothering my brother here. Why can't we look to how the tax is administered in finding that, regardless of what the legislature said, that's not what's going on here? Your Honor, again, we go back to the Chickasaw discussion by Justice Ginsburg. Are you referring to the language? I'm looking at 515 U.S. at 460 that says the state generally is free to amend its law to shift the tax's legal incidence? That is correct. But that doesn't say that we can't look at the practical effect of how the tax is administered, does it? Your Honor, I would suggest that in this situation, when you speak of the practical effect, what you're talking about is the economic incidence of the tax. Is that a euphemism for who pays? It is a term of art for who ends up bearing the economic burden of the tax. I can't figure out how you can say from a statute who bears the economic burden. My thought is that it would always be an empirical question because it's always subject to taxes. The landlord tries to shift them to the tenant in the rent. But if there are a whole lot of vacancies, then rents get forced down to where the landlords have to eat the taxes and they can't shift them to the tenant. It seems like any tax is like that. It just depends on who has the power in the economic relationship, and that varies from time to time. So I wonder if we just need to look at the law to see at who the law imposes the tax on in terms of penalties for not paying a measurement of the amount of tax. Well, Your Honor, there's no question that when you look at those kinds of So, for example, under 63 24064, and this provision was amended, it's a provision that the Idaho Supreme Court I'm catching up with you here, 24064. Okay. And I should add that the, and I'll come back to this in a moment, the Idaho Supreme Court in the Goodman Oil decision was dealing with a prior codification of that statute. The statute was substantially amended by the 2000 legislature. That provision now states that the distributor who fails to pay the tax that is required under this chapter shall be liable to remit to the commission the amount of the tax. Let me ask you about another part of the wording. It looked to me, and I'm not sure I'm looking right, as though the way they measure this tax is by the fuel the distributor receives rather than the fuel the distributor sells. Is that the way the statute is said, structured? That's correct, Your Honor. Does that mean if the distributor receives 100,000 gallons in May and the distributor sells 50,000 gallons to the filling stations on the Indian reservation, the distributor owes the tax on 100,000 gallons, not on 50,000? The distributor owes the tax on the 100,000 gallons, but the distributor may claim a deduction for the 50,000 gallons that are not sold. Again, the tax will then be the actual receipt of the fuel, but there are deductions available, for example, for worthless accounts or for fuel that is not sold. So if the distributor buys it and doesn't resell it, the distributor doesn't owe any tax on it, right? That's correct. I'm sorry. I want to be precise in this point. The tax is owed, but there may be a deduction available. Like a credit. That is correct. So would it be a credit for the whole 100,000 gallons if he sold under Judge Gould's scenario, if he sold none? Well, the answer is no, because 50,000 gallons was sold. If we assume that that amount was paid for and the tax was passed off... That was my hypo. Judge Gould's hypo. He didn't sell any of the gas. He got 100,000 gallons. Oh, I'm sorry. He didn't sell any of the gas. I thought it was 50-50. The answer is the same, whether it's 50 or 100. He didn't pay the tax on whatever he sells. I mean, the distributor owes the tax on the whole amount that gets a credit for what the distributor doesn't sell. That's correct. So the tax is nominally on what the distributor receives, but in substance on what he sells. That's correct. Also, let me ask a general question. If it were as simple as who is the tax to be paid by, who do the legislature say has to pay it, then it seems to me we wouldn't need a test of what's the legal incidence of the tax. I mean, where does that test come from? I thought that was a test the Supreme Court had established, and that incidence in common parlance means something akin to like the economic burden of the tax, where it falls. It means something other than just who pays the tax first. Your Honor, I'm sorry. I didn't mean to interrupt. From the common meaning of the word incidence, I haven't read all the cases where that was established as the test, but I'm assuming that what they're doing is looking under the surface of who pays the tax first. Your Honor, I would, again, respectfully disagree. The notion of legal incidence and economic incidence is developed initially not in an Indian law context, but in the context of taxing the United States, and it is a term of art that is to say legal incidence, which I think first came of age in the late 40s, perhaps early 50s. Well, that's interesting. Can you shed some light on how that tax test was developed? Well, and the issue is whether or not a particular state tax was borne, for example, by a federal contractor, as opposed to the United States itself. As the doctrine has evolved, and much of its use has today fallen into the Indian law context, precisely the kind of situation we have here. And the Supreme Court has carefully distinguished, as it did in Chickasaw and other cases, between which of the economic actors that may be involved in a particular transaction. The state legislature has determined should bear the legal incidence, recognizing that the burden, the economic burden of this tax, as a matter of commercial practice, will be passed on. Because if we were to look at the, if we were to adopt a pure economic burden test, as I think Judge Gould, you might have been suggesting, in this case there's no question who bears the economic burden of this tax, and it's neither the distributor nor the retailer. It is, in fact, the ultimate consumer. But no one contends, in this case, that the ultimate consumer is the, bears the legal incidence of the tax. I'm not suggesting that legal incidence is equated with who pays the ultimate, who has the ultimate economic burden. I'm just suggesting it seemed to me that it means something other than who pays the tax first. Like in your federal contractor example, I assume there, what, were you dealing with cases where the state taxed the contractor in some way? And the question was if it was, in essence, a tax on the United States, then the contractor didn't have to pay it? That's correct. Okay. So there's no question in that kind of case that they're not directly taxing the United States and saying you pay. But if the United States is going to bear the burden of it, then they get it out. Your Honor, I believe it's a little more subtle than that. It is. It's more nuanced. And I think when you look at the, at those cases, first of all, there was no state legislative determination about who was to bear the legal incidence, perhaps because when these cases first developed, the distinction between legal and economic incidence itself had not developed. And then secondly, in those cases, there was a mandatory pass-through. That is to say there was no discretion. The Idaho Act does not require the tax to be passed through. It recognizes, because the legislature deals in something approaching the real commercial world, that as a matter of commercial practice, fuel taxes, in particular, are passed through as an economic matter. As Judge Kleinfeld has suggested, there's no need for that. There can be market forces that dictate a contrary conclusion. But with the particular nature of fuel taxes, they are, in fact, passed through. Economic incidence can be terribly complicated in other contexts. And there's a recent Federal Claims Court case that this Court, if it's interested in that particular, in the complexity of it, can look at. And that's Amex, A-double-M-E-X, Inc. v. United States. It's cited at 56 Federal Claims 1, 2003 case. And it's dealing with Section 26 U.S.C. 6416A, which is a federal statute, obviously enough, and deals with, allows only those who bear, in essence, the economic burden of the tax to get refunds. And it deals with retail excise taxes and manufacturer taxes. So this is, in terms of the economic incidence issue, it can be a complex matter. But it is not a complex matter in this particular situation. Let me revert to my days as a white-collar lawyer and follow the money. Let's go back to the $100,000, $50,000 hypothetical. You're saying the legislature has declared that the distributor owes the tax when he receives 100,000 gallons of gasoline. He then sells 50,000 gallons of gasoline to an Indian retailer who, in turn, sells all 50,000 gallons to people who buy gas from him on the reservation. Tell me how the money flows back to the Idaho Commission in order to meet the tax obligation that the distributor has the legal incidence of bearing. Well, the distributor will file a monthly return. And on that return, the nature of the return is reflected in the regulations that are part of the, that are attached to the affilees brief, but they're also available as a matter of judicial notice. And it will indicate how many gallons were received during a particular month and how many gallons were sold or was transferred. The tax will be owed on all of the fuel. In terms of cash flow- All of the fuel, what? All the fuel that was received? That's correct. In terms of the cash flow, it's difficult to know because it depends on the timing of the sale. But the distributor will be required to pay. So, ultimately, the Idaho Commission gets it. Let's assume the tax is $1 a gallon. Ultimately, the Idaho Commission gets a check for $100,000 from the distributor? It should. That's correct. Okay. Minus perhaps deductions that are available. How the distributor collects from that $100,000 is up to whatever contractual relationship he negotiates with the retailer. And how the retailer collects the money to give to the distributor is up to whatever the retailer decides to sell the gasoline for on the reservation. Is that it? Well, in theory, that's correct, yes. So, at some point, the money flows back to the distributor from his customers? That's correct. They do not remit the money directly to the Idaho Commission? No, Your Honor. The money is remitted directly, and it's a legal obligation of the distributor to remit the money. Okay. The distributor gets a credit if the retailer doesn't collect the tax on 50 of those 100? No, Your Honor. I'm sorry. I interrupted you. The answer is no. The only time that the distributor would receive a credit is if, in essence, his relationship with the retailer went south and an account was worthless. If the retailer doesn't pay him? That's correct, if the account becomes worthless. But if, for example, a retailer sells to some consumer on credit and the consumer defaults, there would be no impact on the obligation of the distributor. There would be no deduction available. Counsel, I'm trying to understand the deductions, and I'm looking at Section 63-2407 on addendum page 47 in your brief. Am I looking in the right place? That's the worthless accounts deduction. It looks to me like if it's not a worthless account, it's a gas station that generally has been paying its bills and they haven't been written off on the distributor's income tax return, then if the distributor receives 100,000 gallons and he sells 50,000 gallons to filling stations on the reservation, he does not get a deduction for the 50,000 that he didn't sell unless he returns it to the refiner. That's right. That's correct, Your Honor. So is there another place where he gets a deduction for the 50,000 that he didn't sell? No, Your Honor. I assumed in my prior response that that fuel was returned. The only fuel distributor that I know personally has a little tank farm, so I don't know if he ever returns fuel or if he just lets it accumulate in his tank farm. I have to admit, Your Honor, I don't know what the industry practices in that regard. Do you know if they return what they don't sell that month? The answer is I don't know. It was the basis for your statement that he gets a deduction for the 50,000 that he doesn't sell. Some other portion of the statute, or was it just a factual assumption that he must return to the refiner whatever he doesn't sell? The latter, Your Honor. In other words, perhaps I've misunderstood, but the... I know a guy who's a Union 76 distributor, right? I don't know if it's still Union 76. I think the name has changed. It might be Chevron now. But he has a little tank farm, and he delivers fuel to the gas stations around town, and I think he just tries to make sure that he gets enough gasoline to keep his tanks high enough and doesn't correlate it closely with how much he sells to the gas stations. He's not just a financial pass-through. He really does get a bunch of gasoline and then sell it, like a furniture store. He has inventory. And I wonder if we assume that hypothetically, that the distributor has a tank farm and he has inventory, then, in my hypo, where the distributor receives 100,000 gallons of gasoline and he sells 50,000 gallons of gasoline that month all to filling stations on the reservation, does he pay taxes on the 100,000 that he received or the 50,000 that he sold? I don't know. The regulations, just to make sure of my answer. I think I know what the answer is, but I think it would be more appropriate for me to be sure. So you really don't know the answer to that right now? That is correct. Is there any place to look other than 2407? The answer is yes, the regulations, and that's what I'm just glancing at. Do we have those handy or do we just have to get them off Westlaw? Your Honor, I believe, as I said before, they're attached as an appendix to the appellees brief. I didn't see the regs in the appendix. They are in the appendix? Okay, thanks. Thank you, counsel. Your Honor, I'm... Oh, you're right, 50 and 52. I'm beyond my 20 minutes substantially. I'm more than willing to go on and go ahead and ask questions. I think we've heard enough for the moment. No, you've been very helpful. Thank you. Very helpful. Counsel? May it please the Court, my name is Douglas Henderson. I'll be presenting an argument for all three tribes this afternoon, Your Honor. Let me first go to the legal incidents question and answer your question, Judge Kleinfeld. The answer in the statute is found at section 2407.2, which is in our addendum, appellee's addendum, at page 47. Section 63-47, Your Honor. It looks like 2407 in your addendum, the page is numbered 7 at the bottom. Am I looking at the right one? This is, I'm sorry, the addendum that is part of our appellee's brief. Followed right after the argument. Got it. Thanks. 63-2407 provides that there's a deduction for motor fuel that is returned to the licensed distributor's refinery or pipeline terminal storage when supported by... Pipeline terminal storage. ...documentation. Excuse me, Your Honor? What's pipeline terminal storage? I believe that's defined in the definition sections of the code, which I'm afraid may not be in the addendum. I think there may be in the other side's addendum. Here it is. 2401 is the definition. But I don't see it. This is really what I was focusing on, and I appreciate your help on this. My thinking was, I'm trying to figure out who's taxed, and I was using my hypo, where the distributor receives 100,000 gallons, and he sells 50,000 gallons to the filling stations on the Indian Reservation, and the other 50 he accumulates in his tank farm, the distributor's tank farm. And I was thinking, it looks like he pays tax on 100,000 gallons, so it really is a tax on the distributor, not on the filling station on the Indian Reservation. But you may be able to show me otherwise by interpreting this subsection 2. Yes, Your Honor. Let me say that the definition of receipt in the motor fuel tax statutes was not changed by the 2002 amendments, and that the tax was imposed on the receipt of motor fuel at the time that Goodman Oil was decided, just as it is today. So this wasn't a change in the motor fuel tax statutes. But I do want to point out that in terms of receipt, and counsel for the state acknowledged this, receipt in practical terms, Your Honor, means the sale of fuel. Why? Well, there's a definition. Really, my experience is limited. I just know this one distributor personally, but I know he actually receives it. Trucks come from North Pole Refinery, I think. I'm not sure what refinery. And they put the fuel into his tank farm. Well, if they do that under the Idaho statute, it's not taxable. And the Idaho statute defines receipt. And this, if I could refer the Court again to our addendum, specifically to page 44. Got it. The definition provides that the person who refines or stores motor fuel doesn't receive it until it's loaded for transport or placed in a container for sale. This is 2403-1A. And it also exempts fuel which is sent from one refinery or terminal to another. This is 2403-2. And then, of course, as we discussed, if the fuel is returned to storage, then it's not taxable. And this is why in practical terms. It's the tank farm that raises the question for me. I'm looking at it a slightly different way, and maybe you could address this. It's keeping that fine salt hypothetical. If the fuel is ultimately returned, then there's no tax on it. Correct your question. If the fuel is not returned and it's held for a time, but then it's sold, I mean, unless the distributor eats it, if the fuel is later sold, then there's a tax on it at the retail level. And if the distributor isn't paid by a worthless account, he gets a credit, right? Yes, Your Honor, that's correct. Ultimately, the fuel either is taxed at the retail level or it's returned and there's no tax. There's no logical hypothetical, in my view, where the fuel would be held indefinitely in a tank, even if that would temporarily require the distributor to pay a tax. Ultimately, he gets that back if he doesn't sell the fuel. He doesn't sell the fuel, he gets it back from the retailer. There's no hypothetical that I can see, subject to being advised of it by one of the parties or one of my colleagues, where the distributor ends up out for the tax without getting it back from the retailer. I can't understand how that would ever occur. That's correct, Your Honor, and that's why the court in Goodman held that the legal incidence was on the retailer and the provisions that the court in Goodman relied on were not affected at all by the 2002 amendments. If I could go to Judge Tallman's question and just describe how this motor fuel tax scheme actually works. It's set out quite plainly in our addendum at page 50. This is Rule 150.01 sub G of the administrative tax rules. This provides that whenever the distributor sells motor fuel to the retailer, the invoice for the sale must show that the tax was charged to the retailer, and it provides three means by which this can be shown. The language of this regulation reflects what the statute requires, and the court in Goodman and the district court here particularly focused on, if I could refer you to the addendum, page 47, language in section 2407 sub 4, which actually states expressly that the distributor is collecting and remitting the tax on behalf of the state and provides a tax credit to the distributor for doing so. The same conclusion, Your Honor, is reflected in section 2435 of the Idaho Code, which is at our addendum, page 49. What that shows is that every time a distributor sells fuel, the tax is included. I thought that was just so that the taxes would be held in trust for the state, and that way if there were disputes between creditors, the state could get its money. Yes, Your Honor, but the statute also makes clear that it's the distributor that is collecting the tax. It's the retailer that's paying it. It's the retailer's funds that are held in trust for payment to the state, and the statute says are not to be considered part of the- It's the money that the distributor has that's held in trust. Yes, it's the money, though, that the distributor receives from the retailer, and the statute directs that a portion of that- The distributor never gets title to the state's share. Yes, Your Honor, correct, and that's because it comes from the retailer. The retailer pays the distributor, and as soon as the retailer makes that payment, that's the state's tax money, and it's the retailer that pays it. Let me back you up to something you were saying before I've been puzzling over. You were saying that 2403, 1A and 2 speak to the incidence of the tax by saying that the distributor doesn't receive the fuel for purposes of being taxed on receipt until the distributor sells it to the filling station on the reservation, if I understood you correctly, but I'm reading those sections, and I don't read them that way. It looks to me like subsection 2 says that there's no receipt when it's shipped from one refinery or pipeline terminal to another refinery or pipeline terminal. Now, those are not distributors' tank farms. A refinery is where they refine the fuel, not where the distributor has it, and a tank and a pipeline terminal is where the refiner sends it through the pipeline, like the Valdez Oil Terminal. Alieska Pipeline carries the fuel from Prudhoe Bay to the Valdez Terminal. That's not a distributor's terminal. They don't distribute there to gas stations. And then 1A says fuel produced, refined, manufactured, and so forth, or stored at a pipeline terminal is received when it's loaded onto tank trucks. And I'm thinking that means as soon as the pipeline terminal loads it into a tank truck for delivery to Danny Distributor, Danny Distributor owes the tax on it, even though he hasn't sold it, even though he may not sell it until next year. The tax incidents may fall in a different year, often very important to people. Let me say that what I was trying to respond to were your questions on receipt, Your Honor. Let me turn to the legal incidence rules, because these demonstrate that legal incidence is not determined by who pays the tax first. And let me describe the legal incidence rules and how they're intended to function. Legal incidence is a test that was established to protect an exempt sovereign's immunity from state taxation. Its purpose is to stop a state from saying that the tax is on one individual, the seller, but then actually requiring that the tax be passed through and collected from another, the purchaser, the retailer, here. That's the purpose of the test. And the test really provides that the state is bound by what it does, that is, who is necessarily responsible for payment of the tax, not by what it says. And this is illustrated by United States v. State Tax Commission. I'm going with you that far. I think you're right. If you have a gross receipts tax, then even if the firm that the state is imposing the gross receipts tax on makes all its sales to federal agencies, I would suppose it would still owe the gross receipts tax. But if it's a sales tax and the ordinance says the tax is on the buyer but the seller must collect it, then probably the federal agencies are entitled to an exemption. Yes, and the rule of law from the United States v. State Tax Commission is that as a matter of law, if the tax statute provides that the distributor remits but must collect it from the retailer, that is, pass it through and then pay it to the state, then as a matter of law, the legal incidence of the tax is on the retailer. And that's the rule. How can that be so, though, if the wholesaler, the distributor, has to pay the tax in May even if he doesn't sell the fuel till December and he has to pay it in 2003 even if he doesn't sell the fuel till 2004? Well, the legal incidence tax says it's not who pays first. The question is, is there a pass-through provision in the tax that requires the retailer, the purchaser, to pay the tax? And that rule set out expressly in the State Tax Commission is the same rule that the Supreme Court applies in the Indian context in Chickasaw and the same rule applied in Moe. That is, if the retailer has to pass the tax through to the consumer, then even though the retailer is making an advance payment of the tax, as was the case in Moe, the legal incidence of the tax is on the party that the tax is passed through to. Now, the state argues that if they make an express assignment of legal incidence, that that's controlling and the pass-through issue need not be addressed. But there's nothing in Chickasaw to indicate that. What they said was the Oklahoma statute doesn't expressly identify who bears the legal incidence, nor does it contain a pass-through provision. The state could do either or. These were alternatives. But what it can't do is say one party has the legal incidence, but another party has to pay the tax. And the reason for that, very plainly, Your Honor, is that would allow the state to defeat an immune sovereign's immunity. It could say legal incidence is on the seller, and then tell the seller, you go get it from the tribe. You collect it. And the Supreme Court has said that can't be done. It was these rules that were applied by the district court, and as the district court noted, the Goodman ruling set out the provisions that Idaho found dispositive of legal incidence, the Idaho Supreme Court, and the legislation chose not to change any of them. The legislation made what appear to me superficial changes in the sense of saying we intend the burden on the distributor, but they didn't change the operative provisions of the tax. That's correct, Your Honor. And, in fact, what the legislature said in the uncodified statement of intent relied on by the state is we intend to change the legal incidence, but that statement was preceded by the legislature's statement that we're doing this so that we can collect taxes on Idaho's Indian reservation. Well, the district court properly held that that was not permitted. You're saying if there's a pass-through, if the tax has a pass-through feature in it, the way it's structured by the legislature, that is what we look to to determine the legal incidence. Yes, Your Honor. The pass-through is dispositive of legal incidence. Let me turn to the Hayden Cartwright question. I have a question for you about that, basically the same question I asked your adversary. Let's assume that this is a tax imposed on fuel sold on Indian reservations for purposes of the question, and I'm wondering why there isn't, I can't remember if you used the word abrogation in this context, in the statute, because any possible ambiguity in the phrase or other reservations is cleared up by the phrase licensed traders. As far as I can tell, the only licensed traders that there are are Indian traders who are licensed under this special Indian reservation, persons permitted to trade with the Indians chapter. Well, Your Honor, let me say that the statute doesn't define the term. It doesn't define any of the list of entities, which includes- Is there any other such thing as a licensed trader, except for these persons with licenses to trade with Indians? Is there any licensed trader that exists in federal law other than Indian traders? Well, this was addressed by the court in Goodman, and Goodman pointed to the Reeves decision, which identifies retailers generally required to have a license, persons selling malt beverages required to have a license. Those are state licenses. Those aren't federal. Well, there's no federal filling station license, of course, Your Honor, and what the statute does is it provides- What I'm getting at is when Congress uses the word licensed trader. Oh, I see. You're saying when Congress used the word licensed trader, it might have meant a bar because they need a liquor license. It meant, as the district court in Goodman, anybody who was required to have a license to trade on the reservation- It might have meant like a lawyer who needs a license or a beautician. It could have meant anybody, Your Honor. It was simply a term that was used, and the Hayden Cartwright Act- If you were to assume, though, that what they were referring to was federal law, then would it mean anything other than Indian traders? Well, of course, under the federal statute, the term is Indian trader. It's not licensed trader. And in the federal Indian trader statutes, they make specific reference, Your Honor, to Indian reservations. Now, the generality of this term shouldn't obscure the fact that whenever Congress intended a statute to apply to Indian tribes, it says Indian tribes. And Indian tribes are clearly not required to have any kind of license to trade on their own reservations. There's ambiguity. Don't we have to give the Indian tribes the benefit of the doubt under the Blackfoot tribes case and other cases? Yes, Your Honor. And in fact, here, the standard is even more demanding. Because of the rules against taxing Indian tribes. Correct. And here- They're showing a little. Yes. The rule here is actually Congress's intent to abrogate must be unmistakably clear. And all courts to consider the question have said that the Hayden Cartwright Act doesn't make it unmistakably clear. And the reason for that, Your Honor, is that the basic objective of this statute was the United States was waiving its immunity on its reservations. Except for fuel for its own exclusive use. Hayden Cartwright administers the statute by the officer in charge of such reservations, saying each month how much fuel was sold that wasn't for the exclusive use of the United States. I was reading it and then looking at this language in the U.S. Code, 25 U.S.C. 264. Any person other than an Indian of the full blood who shall attempt to reside in the Indian country or on any Indian reservation as a trader, or to introduce goods or to trade therein, without such license, shall forfeit all merchandise offered for sale to the Indians or found in his possession and shall moreover be liable to a penalty of $500. And I was thinking, that's what a licensed trader is. Well, but there, Your Honor, Congress specifically used the term Indian reservation. And our point is that when Congress enacted the Hayden Cartwright Act, it was aware that Indian tribes were separate sovereigns, distinct from the United States. Federal law had established the general inapplicability of state law and their immunity from suit. The purpose of the statute, of course, includes that which Congress did not seek to change, just as it does that which Congress sought to change. And here, the state's argument is made, notwithstanding that the statute says nothing about Indian tribes, much less their own separate immunity, which is based on the exclusive authority of the federal government over Indian reservations under the Constitution. Now, the state makes the argument that Indian reservations are included in the term United States military or other reservations. Well, that simply reads United States military out of the statute. And the rule of construction- Why? Well, because the rule of construction is where general words follow specific ones in the statute. The general words are to be construed to include only things similar in nature. Congress had never- is reserved from entry. Until recently, well, in Alaska, until the mid-'70s, in the lower 48, it was a little earlier, any federal lands were subject to entry for homesteads, home sites, mining sites, various ways by which private persons could acquire title from the federal government just by going there, staking it out, and doing some work there. What reservation means is land reserved from entry under the Homestead Act of, I think it was 1863, and the various additions to it over the years. Military reservation is a reservation just because you can't stake out a mining claim there, even if there's gold in the creek. Indian reservation means white people can't go in there and stake out a mining claim just because there's gold in the creek. Same thing with homesteads. You can't go in and stake out a homestead and get title to it just by building a house and working it for a number of years. Whether it's military or Indian, they are the same thing. You can't get title. Well, at a level of generality, one could say Indian reservations could be included in the term, but the unmistakably clear standard doesn't permit that kind of argument to succeed, and that standard recognizes, of course, that if Congress wanted to do it but didn't, that can be fixed quite easily. But the Indian... What else could reservation mean except reserved from entry? I mean, a lot of the reason there are Indian reservations is during the gold rush and then the subsequent land rushes, white people kept taking the Indians' land, and so the federal government wanted to reserve the lands from entry. The only way the white people could take it was under the Homestead Act and the Mining Law of 1872 and so forth. Well, what it means, Your Honor, United States military or other reservations, is referring to federal enclaves, essentially. Other reserves other than military and Indian reservations, there's wilderness reserves. There are probably a number of different kinds of federal reserves. The wilderness is the one I'm specifically quite familiar with, and so it would seem to me that if Congress wanted to intrude on Indian sovereignty by letting states tax them, it should have said Indian reservation in the Hayden-Cartwright Act. That's what all four courts that have considered the question have held, Your Honor. And Congress, before the Hayden-Cartwright Act was enacted, had recognized that Indian reservations were legally distinct from federal enclaves. That is, all other federal areas. There's a lot of federal land that is not reserved from entry, or at least there used to be. Yes, Your Honor. But my point is that what Congress recognized, and this is discussed in the United States v. Celestine, there the court discussed the 1885 Act. This was the predecessor to the Major Crimes Act, and that was passed so that the federal enclave laws would be applicable on, quote, any Indian reservation. If there was no legal distinction between Indian reservations and federal enclaves, that statute would have been unnecessary, as would the 1817 General Crimes Act, which does the same thing, pass a statute that made the federal enclave laws applicable to Indian reservations. That's a little bit different, though, isn't it, Mr. Anderson, in the sense that at the time those statutes were passed, there was an open question as to whether state criminal codes were enforceable in Indian country. And Congress finally resolved the problem by the Major Crimes Act and so on. And that seems to be a little different here, where there's a question as to whether or not the state ever has the power to impose a tax on another sovereign. That's correct, Your Honor. In the special area of taxation, the test is even more demanding. It's the unmistakably clear standard. But my point is that at the time the Hayden-Cartwright Act was enacted, Congress had never treated federal enclaves as including Indian reservations. And there's no reason to believe that it did for the first time in the Hayden-Cartwright Act when neither the text of the Act nor the legislative history mentioned Indians or Indian reservations. A statute which makes no reference to Indian tribes, whose immunity is separate and distinct from that of the United States, which makes no reference to Indian reservations. That brings us back to the question I asked at the outset of your adversary's argument. It seems to me, as I've indicated to you, a reservation is a reservation. It's land reserved from entry. Military, wilderness, Indian, whatever. Reservation means reserved from entry. What's distinct about Indian reservations isn't that they're reservations, but that they're Indian. Because an Indian tribe is a sovereign. And a sovereign is very different from other persons or firms. So, what I was wondering was whether the gist of the Indian's argument cannot be that sales to distributors or resale to filling stations on Indian reservations have to be untaxed, but rather sales where the customer is an Indian tribe or perhaps individual Indians would have to be exempt from tax. Well, it's a distinction in who avoids the tax. And I'm thinking that the tribe has the strongest claim to avoid the tax because it's a sovereign. As far as the sales to the distributor for retails to the filling station on the reservation, that strikes me as a much weaker claim because it's just land, a filling station on land reserved from entry. Anybody can buy. I would expect if they are exempt from tax, it would be just like cigarettes. Everybody would buy their gas on the Indian reservation to avoid paying the tax. Nine-tenths of your customers would be white people. Well, here, of course, Your Honor, the tribes have their own taxes, which is what prompted the litigation. But let me highlight what Your Honor said, that Indian tribes are separate sovereigns with their own sovereign rights, including immunity from state taxation. Right, I'm thinking the tribe, when it sends some tribal truck around to the gas station, they ought to be able to show their tribal credit card that they're paying with and sign a form saying it's purchased by the tribe and not pay the tax. Well, Hayden-Curtright, I would say, doesn't purport to make Indian tribes subject to state tax. But our point is that it doesn't make it unmistakably clear that the act applies to Indian reservations because there, the tax immunity of tribes is separate and distinct from the United States. The source of sovereignty is separate. The reservation is the homeland of the tribe that is to be the place where the tribe engages in the economic activity. The tribe is separate. Everything you said up to the reservation is the homeland of the tribe, I buy. But the reservation is just whatever land the feds have assigned as reserve for entry and for the use of that tribe. And it may even be hundreds of miles from the tribe's homeland, like with the Cherokees. But once it's set aside, Your Honor, it's called an Indian reservation. And it is distinct from military reservations, national parks, national forests, distinct from every other kind of federal area. Now, the point that I'm making was the basis of the holding in the Supreme Court in Warren Trading Post. There, the court considered whether the Buck Act, which allows state sales tax in federal areas, the court considered whether that meant Indian reservations. And the Buck Act defined federal areas as any lands held or acquired by the United States. The Supreme Court easily concluded that that didn't include Indian reservations. And it reaffirmed that holding in Central Machinery and in the more recent Bracker case. The other case that I would point to the court that demonstrates how high the standard is, is Bryan v. Itasca County. There, public law authority said the civil laws of such states shall apply in Indian country. The state said, that means our tax laws. The Supreme Court said no. The state said, well, there's a specific provision in here that says state taxation won't apply to Indian trust property. The Supreme Court said, no. You can't imply the power to tax from negative implication. Well, the same is true of the state's arguments here. Whatever arguments are urged under the view that, well, it could have been this, it could have been that. That's simply not sufficient, Your Honor. Again, the unmistakably clear standard recognizes that if Congress wanted to do it, it can fix it. But if Indian immunity from state taxation is held to be abrogated, that's not a fixable problem for Indian tribes. Could Idaho impose a tax on non-Indians who buy gas at filling stations in Indian country? Well, what the court suggested in Chickasaw was that the state should place the legal incidence on the consumer. And that's what most states have done with cigarette taxes. But here, Idaho chose to place the legal incidence on the retailer. And even after Goodman, the Idaho legislature didn't change any of the provisions that its own court relied on. Instead, they enacted emergency legislation, as Section 14 says. A statement of intent says, we're enacting this to apply it to Idaho's Indian reservation. Exactly what the legal incidence test is intended to prevent, a sovereign saying legal incidence is on one party so that it can actually do tax collection from the immune sovereign. Thank you very much. Well, that was a very fine argument as well. Colonel Wayne V. Hammond is submitted. We appreciate your helpful work. Go ahead and read it off. I apologize for that. Thanks. Thanks very much. You both did a great job. Yeah, it was very interesting. Typical, interesting case. Appreciate it. All right. I would point out that this is part of a supplemental excerpt from Record 49 and 50 that compares the Goodman statutory language in the Fuel Tax Statute at Goodman versus the changes and shows the important changes that were barred on each of the relevant provisions. We'll take a look at it. Thank you. Thank you.
judges: Kleinfeld, Gould, Tallman